UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PAUL C. JENSEN                                                            CIVIL ACTION

VERSUS                                                                    NUMBER: 13-3046

NATIONAL ASSOCIATION OF                                                   SECTION: "F"(5)
LETTER CARRIERS, AFL-CIO, ET AL.

**ORDER AND REASONS**

This is an action under the Postal Reorganization Act ("PRA"), 39 U.S.C. §1208(b), the statutory analogue to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), which applies to private litigants only.  Plaintiff in this case, Paul C. Jensen ("Jensen"), a former letter carrier, brings claims against:  (1) Patrick Donahoe, Postmaster General, United States Postal Service ("USPS") for breach of the collective bargaining agreement ("CBA" or "National Agreement") between the USPS and co-Defendant, the National Association of Letter Carriers, AFL-CIO ("NALC" or "Union"); and (2) the NALC for breach of its duty of fair representation.  (Rec. doc. 44-1).  This type of action is known as a "hybrid Section 301" action."  (*Id.* at pp. 12-14).

Before the Court are the following motions:

1. Motion for summary judgment filed by Jensen.  (Rec. doc. 44).  Both Defendants filed opposition memoranda.  (Rec. docs. 54, 56).  Jensen filed reply memoranda to each opposition.  (Rec. docs. 63, 65);

2. motion for summary judgment filed by NALC.  (Rec. doc. 42).  Jensen opposed this motion.  (Rec. doc. 57); and

    3.  motion to dismiss and/or for summary judgment filed by USPS.  (Rec. doc. 43).

Jensen opposed this motion as well.  (Rec. doc. 58).

All told, the parties have expended almost 1,000 pages in arguing and supporting their positions for and against summary disposition of this case.  In addition to reviewing those many pages of pleadings and exhibits, the Court heard oral argument on the motions on April 8, 2015.  (Rec. doc. 66).  Based upon all of the foregoing, and for the following reasons, the Court finds that Jensen's lawsuit against both USPS and NALC is time-barred and should therefore be dismissed.  Accordingly, USPS' motion for summary judgment is hereby GRANTED.  Because the effect of this decision is that Jensen is foreclosed from pursuing any claims against either Defendant, both his motion for summary judgment and NALC's motion for summary judgment are DISMISSED as moot.[1]

### I.    BACKGROUND

The background facts as recited herein are taken primarily from Jensen's own motion for summary judgment.  For present purposes, the Court accepts them as true.

Jensen was hired as a part-time letter carrier on September 12, 1987 by USPS.  (Rec. doc. 44-1 at p. 3).  He was based out of the Elmwood Station and his designation was Part-Time Flexible ("PTF").  (*Id.*).  After two years, Jensen became a full-time City Carrier.  (*Id.*).  He worked as a full-time City Carrier from 7:30 am to 4:00 p.m., five days a week for the next 10 years.  (*Id.*).  On April 5, 1999, Jensen injured his knee on the job and, as a result, had a compensable claim with the U.S. Department of Labor's Office of Workers' Compensation ("OWCP").  (*Id.*).  After recovering from knee surgery, Jensen returned to

---

[1] In its motion for summary judgment, NALC did not argue that Jensen's claims against it were untimely, but USPS did.  As is explained below, however, because this is a hybrid §301 action, the untimeliness of the claim against NALC ultimately inures to the benefit of both Defendants.

2

work in a limited-duty status on November 18, 2000.  (*Id.*).  He resumed his prior schedule but was designated as a Modified Carrier, rather than a City Carrier.  (*Id.*).

On January 13, 2001, Jensen's manager presented him with a Limited Duty Job Offer ("LDJO") for work at his regular Elmwood Branch location with his regular weekly schedule and regular work hours.  (*Id.*).  The listed duties included "writing 2nd notices, returning UAA mail, answering the phone, endorsing carrier mark-ups, and distributing mail in the box section."  (*Id.*).  Jensen "gladly accepted the offer."  (*Id.*).  He claims to have adjusted to his new daily tasks, reaching maximum medical improvement shortly thereafter.  (*Id.*).

On February 1, 2001, Jensen's physician, Dr. Julio Bravo, informed the USPS that Jensen had reached maximum medical improvement and submitted Jensen's Form CA-17 (which described Jensen's medical restrictions at that time) to the USPS.  (*Id.*).  Jensen continued to work in accordance with this LDJO for the next 11 months, until November 26, 2001, when Manager Alvin Every ("Every") and Supervisor Earl Pelitere, Jr. ("Pelitere") presented him with a new LDJO that was identical in all respects to the former one, but with different work hours.  (*Id.*).  This LDJO listed daily work hours of 9:30 a.m. to 6:00 p.m., as opposed to Jensen's usual 7:30 a.m. to 4:00 p.m. schedule.  (*Id.*).  Every apparently explained to Jensen that he was being assigned to different work hours because of new medical restrictions that the USPS had recently received from Jensen's physician.  (*Id.*).  When Jensen later learned from Dr. Bravo that he had not adjusted Jensen's medical restrictions as suggested by Every, he submitted a FOIA request for a copy of the alleged new medical restrictions.  (*Id.* at p. 4).

Jensen claims that the USPS' response to the FOIA request acknowledged that it did not have a copy of the "new medical restrictions" that supposedly had necessitated the

3

schedule change. (*Id.*). Jensen believed that the changes in his work hours violated the obligations outlined under Section 546.142 of the Employee and Labor Relations Manual ("ELM"). (*Id.*). Accordingly, he completed a "PS Form 2564-a" claiming discrimination and sent it to the EEO Office in New Orleans. (*Id.* at p. 5). The EEO ultimately facilitated a settlement agreement between Jensen and management, in which the USPS acknowledged the fact that the 9:30 a.m. to 6:00 p.m. job offer did not comply with the ELM. (*Id.*). The agreement stated that the parties mutually agreed that the 7:30 a.m. to 4:00 p.m. work schedule of the new LDJO would be changed "in accordance with Chapter 5 of the Employee and Labor Relations Manual" (*Id.*). For the next six years, Jensen worked as a full-time Modified City Carrier at the Elmwood Station with those work hours. (*Id.*).

Fast forward to the spring of 2010, when Jensen claims the USPS suddenly began to withhold his duties from him. (*Id.* at p. 6). Beginning in April 2010, Jensen claims he was instructed to sit in the break room all day and do no work. (*Id.*). On the day he was given this instruction, Jensen accepted it "under protest" and signed out on Leave Without Pay ("LWOP"), citing headaches and stress. (*Id.*). For two months, Jensen reported for work every day according to his regular schedule but sat idly in the break room. (*Id.*). He filed a grievance claiming that management had violated the National Agreement when they instructed him to sit in the break room without working. (*Id.*). On August 24, 2010, Manager Brent Royal ("Royal") released Jensen from duty under "the National Reassessment Program's (NRP) Phase 2 designation 'no work available'" (*Id.*).

On March 7, 2011, a hearing was held before Arbitrator Louise Wolitz ("Wolitz") on Jensen's grievance. The issue presented to Wolitz was: "Did management violate the National Agreement when the grievant Paul Jensen sat in the break room while in pay

4

status under code 604? If so, what is the remedy?" (*Id.*). The NALC, on Jensen's behalf, argued that the USPS had violated the ELM by assigning Jensen to sit idle in the break room and that this assignment was made to purposefully set Jensen up for being removed from his position because there was no work available for him. (*Id.*). Wolitz issued an arbitration award sustaining Jensen's grievance and ordering that he be immediately restored to full limited duty at his station and be "promptly made whole." (*Id.*).

Despite this award ordering the USPS to immediately restore Jensen to full limited duty, he claims that the USPS did not invite him back to work until May 4, 2011. (*Id.* at p. 9). Jensen claims that when he returned to work, Manager Chastity Bart told him there was no work available for him and sent him home. (*Id.*). Jensen filed another grievance against the USPS, this time for its failure to comply with the March 7, 2001 arbitration award. (*Id.*).

On June 2011, a grievance hearing was held before Arbitrator Patrick Halter ("Halter"), the issue being: "Did management violate the National Agreement when the grievant was sent home 'no work available?'" (*Id.*). On July 19, 2011, Halter sustained Jensen's grievance and issued an arbitration award ordering that Jensen be made whole, in accordance with the remedy rendered by Arbitrator Wolitz. (*Id.*).

On December 28, 2011, Arbitrator Wolitz sustained yet another of Jensen's grievances for management's failure to comply with her March 7, 2011 arbitration award, mandating that Jensen be restored to his eight-hour limited-duty assignment at his station and receive all due back pay and benefits by March 1, 2012. (*Id.* at p. 9).

On March 3, 2012, two days after Arbitrator Wolitz' deadline, supervisor Juana Richardson presented Jensen with an LDJO with work hours of 9:30a.m. to 6:00 p.m. and duties that included "PM cage duties" that were outside Jensen's standing restriction. (*Id.*).

5

On March 27, 2012, Jensen was presented with another LDJO that did not meet the criteria set forth in the ELM § 546.142 and with work hours of 9:30 a.m. to 5:00 p.m. (*Id.*). The USPS continued to state that it could not assign Jensen his original work hours of 7:30 a.m. to 4:00 p.m. because he was unable to perform any of the job tasks available between 7:30 a.m. and 9:30 a.m. (*Id.*). Jensen claims USPS ignored his Request for Information seeking a written explanation as to why he could not perform certain jobs and that he formally declined the modified assignment offer. (*Id.*). At this point, he claims he became "more and more depressed" and was diagnosed with Major Depression, for which he states he is still undergoing psychological treatment. (*Id.*).

Jensen eventually filed a claim with the OWCP for Adjustment Disorder with mixed Anxiety and Depressed Mood, a condition he claimed had been caused by management's unrelenting poor treatment of him. (*Id.*). On June 28, 2012, two grievances were combined and resolved in a Step B decision requiring management to schedule a meeting with Jensen to draft a new LDJO, in accordance with ELM § 546.142, including casing duties upon his return to work. (*Id.* at p. 10). Despite this, on July 26, 2012, USPS presented one of the same LDJOs it had previously presented to Jensen, rather than draft a new LDJO as mandated. (*Id.*). This LDJO had work hours of 9:00a.m. to 5:30p.m., in violation of ELM § 546.142 and grievance 141/142, along with the previous arbitration awards and the National Agreement. (*Id.*). Jensen accepted this LDJO "under protest," noting that the LDJO violated the Step B decision and ELM § 546.142. (*Id.*). This July 26, 2012 offer was the last offer the USPS ever presented to Jensen.

In response to this non-compliant job offer, Defendant, NALC, advised Jensen to file yet another grievance. (*Id.*). NALC had consistently advised Jensen to file grievances in

6

Case 2:13-cv-03046-MBN   Document 68   Filed 05/08/15   Page 7 of 15

these circumstances and the record reflects it had been consistently successful on his behalf in doing so.  At this point, however, Jensen began agitating with NALC that it file a lawsuit in federal court to enforce the previous arbitration awards, rather than file yet another grievance, which he believed would be "futile."  (*Id.*).  As part of his efforts to convince NALC to file suit on his behalf, Jensen wrote NALC's Executive Vice-President, Timothy O'Malley ("O'Malley"), asking that NALC pursue these issues in federal court.  (Rec. doc. 1 at ¶ 53).  O'Malley responded on October 1, 2012 that any further issues in this regard should be addressed to National Business Agent, Peter Moss ("Moss").  (*Id.* at ¶ 54).  Jensen did just that and received a written response from Moss on **October 29, 2012** (that was dated October 26, 2012) stating that he (Moss) could not help Jensen with his request to file suit.  (*Id.* at ¶ 56).  Unsatisfied, Jensen wrote O'Malley again, but received a letter on **November 23, 2013** that was "totally devoid of any mention of the NALC going to Federal District Court on behalf of Jensen."  (*Id.* at ¶ 59).[2]

Jensen filed his Complaint on **May 17, 2013**.

---

[2]  While NALC did not file suit, it did file another grievance on Jensen's behalf.  As with all the previous ones, this grievance was upheld by the arbitrator and an award was issued on September 27, 2013 ordering USPS to formulate a new LDJO for Jensen.  (Rec. doc. 43-1 at p. 6).  This occurred after Jensen filed the instant suit on May 17, 2013.

7

## II. THE RELEVANT LAW APPLICABLE TO THE PRESENT MOTIONS

*A. Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law identifies the facts in a case that are "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions or only a scintilla of evidence." *Warfield v. Bryon*, 436 F.3d 551, 557 (5th Cir. 2006)(quoting *Freeman v. Texas Dept. of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). If the non-movant bears the burden of proof at trial, the movant on motion for summary judgment need not support the motion with evidence negating the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the non-movant's case. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990).

B.  *The Labor Management Relations Act*

In this hybrid Section 301 case, Jensen alleges that the NALC breached its duty of fair representation when it acted arbitrarily, in bad faith, or discriminatorily by not timely filing a Section 301 case in federal court on his behalf to remedy the USPS's non-compliance with various arbitration awards and settlements.  He further contends that the USPS violated the terms of the CBA by refusing to comply with those awards, settlements and the Step B resolution.

Section 301 of the LMRA, 29 U.S.C. § 185, provides an employee with a federal cause of action against his employer for breach of a collective bargaining agreement.[3]  *Bache v. American Tel. & Tel.*, 840 F.2d 283, 287 (5th Cir.), *cert. denied*, 488 U.S. 888 (1988)(citation omitted).  The suit against the union for breach of the duty of fair representation is implied under the scheme of the NLRA.  *Daigle v. Gulf State Util. Co.*, 794 F.2d 974, 977 (5th Cir. 1986), *cert. denied*, 479 U.S. 1008 (1986).  Because Jensen has sued the USPS for a breach of the collective bargaining agreement <u>and</u> has sued the labor organization that represents him for breaching its duty of fair representation, his suit is characterized as a "hybrid Section 301/duty of fair representation" action.  *See Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 410-11 (5th Cir. 1990), *cert. denied*, 498 U.S. 895 (1990).

An employee who sues under Section 301(a) is not required to sue both his employer and the Union.  "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both."  *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 165 (1983); *Thomas v. LTV*

---

[3]  A claim against the Postal Service for violation of a collective bargaining agreement is properly brought pursuant to 39 U.S.C. § 1208(b), which is the Postal Service's analogue to Section 301(a) of the LMRA.  *McNair v. United States Postal Serv.*, 768 F.2d 730, 735 (5th Cir.1985).  Accordingly, decisions under Section 301 governing an employee's right to challenge an adverse employment decision are fully applicable here.  *Id.*

*Corp.*, 39 F.3d 611, 621 (5th Cir. 1994). "Whether the employee sues both the labor union and the employer or only one of those entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990)(citation omitted).

Consequently, in order to prevail in this suit, Jensen must prove both that the NALC breached its duty of fair representation and that the USPS breached the CBA. If he cannot prove either one of these facts, he cannot prevail on his hybrid claim. The order of proof is important as well, as establishing the Union's breach of duty of fair representation is an "indispensable predicate" for a Section 301 action against the USPS. *Thomas*, 39 F.3d at 621–22. Thus, "a plaintiff must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer." *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 67 (1981).

Notably for present purposes, hybrid Section 301 claims such as this are subject to a six-month statute of limitations, as set forth in Section 10(b) of the NLRA. 29 U.S.C. § 160(b); *DelCostello*, 462 U.S. at 171-72; *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 299-300 (5th Cir. 1994)("*Barrow II*")(applying six-month limitations period to claim that employer breached CBA and union breached duty of fair representation by not timely filling all positions); *Barrow v. New Orleans Steamship Ass'n*, 932 F.2d 473, 480 (5th Cir. 1991)("*Barrow I*")(applying six-month limitations period to claim that employer breached the CBA and union breached its duty of fair representation by agreeing to adopt a new seniority system); *see also Landry*, 901 F.2d at 411-12 (rejecting the plaintiffs' argument that the six-month limitations period does not apply to claims that arise from the process of

10

contract negotiation). "The statutory period begins to run when the plaintiff either knew or should have known of the injury itself, *i.e.*, the breach of duty of fair representation, rather than of its manifestations." *Barrett v. Ebasco Constructors, Inc.*, 868 F.2d 170, 171 (5th Cir. 1989); *see also Barrow I*, 932 F.2d at 480 ("The statute of limitations period began to run when Barrow discovered that the [collective bargaining agreement] was violated."). The limitations period applies to claims against both the employer and the union. *DelCostello*, 462 U.S. at 169 n. 19 (noting that an alternative limitations period proposed by the dissenting justice would have had "the unfortunate effect of establishing different limitations period for the two halves of a Section 301/fair representation suit.").

Jensen filed his lawsuit on May 17, 2013. If he knew or should have known that NALC was not going to file suit on his behalf before November 17, 2012, his suit is time-barred. As was the case with the plaintiff in *Barrow II*, Jensen "undercuts his own position" on this issue because he admitted under oath that he actually concluded he would have to file this lawsuit more than six months prior to filing it. This sworn admission is dispositive of this suit.

### III. **JENSEN'S SUIT IS TIME-BARRED**

Notably for purposes of these motions, Jensen stated in his Complaint:

> [t]his lawsuit was timely filed within 6 months of 11-23-12, when Jensen knew that NALC would not pursue a Section 301 case in federal court to remedy the noncompliance of the USPS with the arbitration decisions, the settlements and the Step B team resolution. When Jensen received O'Malley's letter he knew that there was a final breakdown of the grievance process regarding Jensen's attempt to get the union to enforce the binding decisions, settlements and resolution.

(*Id.* at ¶ 60).

Jensen, through counsel, has continued to take the position – particularly in opposition to the USPS' statute of limitations argument in its summary judgment motion – that O'Malley's November 23, 2012 letter, devoid of any reference to litigation, was the "trigger" for the 6-month statute of limitations to begin to run.  In fact, in opposition to that motion, Jensen states:

> [o]n November 20, 2012, Jensen knew that any further attempt to get NALC to go to court to enforce the awards was futile and redundant.  At this point, he decided he would have to take the matter to federal court himself.

> (Rec. doc. 58 at p. 11).

In its summary judgment motion, USPS argues that the six-month limitations period began to run, not upon Jensen's receipt of the November 20th O'Malley Letter, but upon Jensen's receipt of Moss's October 26, 2012 letter and that his lawsuit, filed on May 17, 2013, was untimely because it was filed more than six months after his receipt of that letter on October 29, 2012.  (Rec. doc. 43-1 at p. 16).  In support of this argument, USPS quotes Jensen's own sworn testimony from his deposition in this case:

> Q.  And then what you had previously handed me, that I'm going to mark as Exhibit 80, Mr. Moss's [October 26, 2012] response to you with respect just to the filing of a suit in Federal District Court.  Mr. Moss responded to you that [he] is not an attorney.  He does not have a legal background and he did not have knowledge of Section 301 of the Labor Management Relations Act and therefore he couldn't help you; is that correct?
>
> A.  That is correct.
>
> Q. Okay. **So that was your understanding that you weren't going to get assistance from the union in filing a suit in Federal District Court?**
>
> A. **Yes, ma'am**.  That let me know after four arbitration rulings.  We had testimony with the union earlier this week with the

vice-president in Washington, D.C. and we asked him how many grievances would we file, how many more, what number would it take before the union would go to court with this issue and the answer was, there is no number. We think Mr. Jensen should file another grievance and they'd try to get it right this time or get it resolved but the answer was, file another grievance, **so at that point I knew this was futile and redundant** and when I got no, I'm not an attorney, I can't help you, I thought I might get like, I'm not an attorney. I'll check with the attorneys but, no, I can't help you. **At that point I knew, well, that was it**. I had no other option to resolve this because it's affecting my health and I'm going to have to have this ended. The post office, as we heard yesterday from Mr. Felger, they're going to follow the NRP. They're not going to obey the arbitrator's ruling. He came out and acknowledged that, so if the post office is not going to acknowledge the arbitrator's rulings and the union is only going to file grievances and get more arbitrator's rulings, **then the only way for me to get this resolved is if the union won't go to court then I must and that's why I have to bring this suit**. The union really should be bringing this suit against the post office for noncompliance. They don't want to. I have to.

(Rec. doc. 43-5 at p. 41)(emphasis added)[4]

In response to this argument, Jensen ignores this testimony and attempts to claim that the "trigger" for the limitations period to begin running was his receipt of O'Malley's letter on November 20, 2012. In doing so, Jensen, through counsel, does not so much disavow that testimony as simply ignore it in an attempt to create a factual dispute. Speaking directly to USPS's Statement of Undisputed Facts No. 32 (rec. doc. 43-12), which, citing the above-quoted testimony, reads, "Plaintiff knew that it was futile and 'redundant' seeking the Union's assistance with filing a suit in district court when he received Pete

---

[4] Jensen provided this testimony directly in response to questions about the October 26th Moss letter. The Court's review of Jensen's deposition transcript, the entirety of which was attached by USPS as an exhibit to its motion for summary judgment, reveals that the November 26th O'Malley letter was neither discussed in nor attached as an exhibit to the deposition. (Rec. doc. 43-5 at p. 1). Therefore, the above-quoted testimony confirming Jensen's actual knowledge of NALC's alleged breach of its duty of fair representation could not have been given in regard to the later O'Malley letter.

13

Moss' letter dated October 26, 2012," Jensen states in a signed, but un-notarized, "declaration:"

> Tim O'Malley was the decision maker on whether the union would bring a Section 301 action against the USPS. I knew it was futile to ask the NALC any further to go to court after Tim O'Malley made no mention of going to court in his 11- 20-12 letter to me. Rec. Doc. 44-9, p. 23. In my letter dated 8-20-12, I specifically asked Mr. O'Malley to file a Section 301 case in federal court against the USPS to enforce the arbitration awards that the USPS was ignoring. Rec. Doc 44-9, p. 22. At this point, 11-20-12, when O'Malley completely failed to address my request to go to federal court, I knew that he would have to go to federal court to enforce of the arbitrators' awards.

(Rec. doc. 57-2 at ¶ 20).

Importantly, nowhere in the record does Jensen address, disavow or otherwise attempt to explain his sworn deposition testimony that he actually knew upon receipt of the Moss letter that he had no choice but to file "this suit" on his own. While Jensen is free to ignore this testimony and its importance here, the Court cannot.

The limitations period in this matter began to run on the date Jensen knew or should have known that NALC had breached its duty of fair representation to him by refusing to file a lawsuit. The Court need not cast about for evidence to indicate when Jensen <u>should</u> have known anything – he testified under oath that he <u>actually</u> knew the union would not file suit upon receipt of Moss's letter on October 29, 2012. His *ex post facto* effort to change the trigger date by alluding to O'Malley as the "decision maker" does not change this testimony.[5]

---

[5] In this vein, the Court notes that, in his own motion for summary judgment, Jensen observed as to USPS's witnesses "a party cannot create a material issue of fact by having two of its witnesses give conflicting testimony." (Rec. doc. 44-1 at p. 15). Jensen is going USPS one better here – he is attempting, albeit ineffectively, to contradict <u>his own</u> sworn testimony. That he does so without any effort to explain why his earlier testimony was wrong ultimately renders the effort unavailing.

Because this lawsuit was filed after the six-month limitations period had run, it is untimely and must be dismissed. Accordingly, the motion for summary judgment filed by the USPS is hereby GRANTED. Because that action results in the dismissal of all of Jensen's claims against both Defendants (*Thomas*, 39 F.3d at 621–22; *Mitchell*, 451 U.S. at 67) the Court need not address the remaining arguments on the merits of the USPS, NALC or Jensen and hereby DISMISSES AS MOOT the motions for summary judgment filed by Jensen and the NALC.

New Orleans, Louisiana, this  8th  day of _____ May _____, 2015.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE